IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| BRYAN CHADWICK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 08-3098-CV-S-REL-SSA |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Bryan Chadwick seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) discrediting the opinion of Dr. William Sunderwirth, (2) failing to properly evaluate plaintiff's credibility, and (3) failing to adopt the testimony of the vocational experts that plaintiff is disabled. I find that the substantial evidence in the record as a whole supports the ALJ's determination. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.  BACKGROUND

On November 22, 2004, plaintiff applied for disability benefits alleging that he had been disabled since October 18, 2004. Plaintiff's disability stems from fibromyalgia,

restlessness, impaired concentration, pain, headaches, sleeplessness, depression, and muscle tension.  Plaintiff's application was denied on January 3, 2005.  On March 2, 2006, a hearing was held before an Administrative Law Judge.  A supplemental hearing was held on July 17, 2006.  On September 8, 2006, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On March 8, 2008, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876

2

F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing <u>Steadman v. Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." <u>Id</u>.; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion

3

shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.   Is the claimant performing substantial gainful activity?

>           Yes = not disabled.
>           No = go to next step.

2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

>           No = not disabled.
>           Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

>           Yes = disabled.
>           No = go to next step.

4.   Does the impairment prevent the claimant from doing past relevant work?

4

No = not disabled.
Yes =  go to next step where burden shifts to Com-missioner.

     5.   Does the impairment prevent the claimant from doing any other work?

Yes = disabled.
No = not disabled.

## IV.  *THE RECORD*

The record consists of the testimony of plaintiff and vocational experts George Horne and Cathy Hodgson, in addition to documentary evidence admitted at the hearing.

## A.  *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

### Earnings Record

The record shows that plaintiff earned the following income from 1985 through 2003:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1985 | $ 1,875.00 | 1995 | $ 8,622.52 |
| 1986 | 0.00 | 1996 | 12,568.04 |
| 1987 | 1,058.50 | 1997 | 14,653.36 |
| 1988 | 5,384.62 | 1998 | 15,993.74 |
| 1989 | 5,315.55 | 1999 | 17,408.95 |
| 1990 | 6,579.01 | 2000 | 16,571.41 |
| 1991 | 4,633.85 | 2001 | 17,530.02 |
| 1992 | 2,157.15 | 2002 | 17,499.10 |
| 1993 | 8,505.37 | 2003 | 17,655.02 |
| 1994 | 8,807.40 | | |

5

(Tr. at 45).

**Disability Report**

In an undated Disability Report, plaintiff reported that the condition causing his disability was fibromyalgia (Tr. at 52-57A). His condition first bothered him in 1986 and caused him to be unable to work on October 18, 2004. He needed no changes to his job duties, and he made no job-related changes such as attendance or help needed. He stated that he just had to reduce his hours to part time. He reported that he had "four or more years of college" which he completed in 1992.

**Disability Report - Field Office**

On June 7, 2005, plaintiff met face to face with J. Cook of Disability Determinations (Tr. at 58-60). J. Cook observed that plaintiff had no difficulty with understanding, coherency, concentrating, sitting, standing, or walking.

**Undated/Untitled Form**

In an undated and untitled form, plaintiff was asked if he was currently working and if so to explain (Tr. at 61). He wrote, "Yes. At my request, I work part time, 4 hours a day, 5 days a week. I have bills to pay. If I could quit right now I would due to the pain and fatigue." He noted that he had received no treatment since he filed his claim and had no upcoming appointments.

6

**Function Report**

In a Function Report dated December 28, 2004, plaintiff described his day as getting up, going to work for four hours, then coming home and basically watching television for the remainder of the day (Tr. at 78). He was able to do some miscellaneous chores, cook meals, do laundry, and wash dishes. He was living in an apartment with his girl friend. He reported no problems with personal care. He said that he was able to clean, do laundry, do household repairs, iron, and mow, but "depending on how physical I get I will pay for it later in pain and fatigue."

When asked to circle abilities that are affected by plaintiff's condition, he circled lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, memory, concentration, and getting along with others (Tr. at 83). However, on the same form, plaintiff was asked if he has any problems getting along with family, friends, neighbors, or others, he checked, "no" (Tr. at 83). When asked how long he can pay attention, he wrote, "As long as it takes." (Tr. at 83). He said he follows written instructions "very well." He gets along with authority figures "just fine." He indicated that he does not handle stress well, as it causes him fatigue and he has no energy. He has no problem handling changes in routine.

7

**American College of Rheumatology:  Criteria for the
Classification of Fibromyalgia**

In this article, the following conclusion is reached:  "The
presence of 11 of 18 tender points (defined as mild or greater
tenderness) in the presence of widespread pain provided the most
sensitive, specific, and accurate criteria for the diagnosis of
primary, secondary-concomitant, and the combined fibromyalgia
syndrome."  The exact locations of the 18 tender points were
shown in the article (Tr. at 127).

**B.    *SUMMARY OF MEDICAL RECORDS***

The record shows that plaintiff saw William Sunderwirth,
D.O., 11 times from September 10, 1987, through September 9, 1989
(Tr. at 152-154).  Plaintiff's first visit was six months after
he had been in a car accident, and he complained of back pain.
He saw Dr. Sunderwirth four times during 1987 and six times
during the first half of 1988.  On June 10, 1988, the records
refer to a report of Dr. Harrington with a diagnosis of
fibromyalgia.  There is no indication that Dr. Sunderwirth did
any testing for fibromyalgia or what testing Dr. Harrington had
done in this report referred to by Dr. Sunderwirth.  During 1998
plaintiff was taking Soma, a muscle relaxer, and Fiorinal #3.[1]

---

[1]Fiorinal #3 is a combination of aspirin; caffeine;
butalbital, a barbiturate which slows down the central nervous
system and causes relaxation; and codeine, a narcotic.

8

On June 20, 1989, plaintiff called in requesting refills of Soma and Fiorinal. Dr. Sunderwirth refilled the Soma but refused to refill the Fiorinal. Plaintiff had said that he increased his dose from one pill to two for pain relief. Dr. Sunderwirth told plaintiff it was "best not to keep increasing Fiorinal." On July 6, 1989, plaintiff's mother called Dr. Sunderwirth complaining about his refusal to renew plaintiff's Fiorinal prescription. Dr. Sunderwirth told her that if he were to continue plaintiff's Fiorinal, he would want a consultant to agree with that. On July 14, 1989, the two-line record says that plaintiff "still has back pain. Especially about the left shoulder. Dx. Fibromyalgia." That is the first time Dr. Sunderwirth diagnosed fibromyalgia, and there is nothing in this very brief medical note indicating why he made such a diagnosis other than plaintiff's complaints of continued back pain and left shoulder pain.

Plaintiff continued to report back pain to Dr. Sunderwirth in 1990 (Tr. at 154). He saw Dr. Sunderwirth four times during that year. On February 19, 1990, Dr. Sunderwirth prescribed Restoril (treats insomnia) because plaintiff said he had difficulty sleeping due to back pain. On June 22, 1990, he prescribed Naprosyn (non-steroidal anti-inflammatory), and Elavil (antidepressant). The diagnosis is listed as fibromyalgia, but the records do not indicate that any exam was performed or that

9

any tests were done. On July 31, 1990, plaintiff reported that
the Soma helped more than the Naprosyn. He said he felt groggy
in the morning due to Elavil. Dr. Sunderwirth told plaintiff to
continue the Soma, Elavil, and Naprosyn. On September 18, 1990,
plaintiff reported cold symptoms. There is no mention of
plaintiff's back pain or fibromyalgia.

Plaintiff saw Dr. Sunderwirth six times in 1991 (Tr. at
155). On January 3, 1991, plaintiff was diagnosed with
bronchitis. On February 26, 1991, plaintiff reported that he was
having difficulty sleeping. "Elavil and Soma not helping. Wants
Fiorinal #3. Discuss chronic use of Fiorinal #3. He feels
present problem is temporary." Dr. Sunderwirth gave plaintiff a
prescription for Fiorinal. On March 28, 1991, plaintiff called
in requesting a refill of Fiorinal, and Dr. Sunderwirth approved
the refill. On May 9, 1991, Dr. Sunderwirth called in another
refill for Fiorinal. On June 18, 1991, Dr. Sunderwirth called in
another refill of Fiorinal. On July 9, 1991, plaintiff saw Dr.
Sunderwirth and complained of back pain and a stiff neck.
Plaintiff said that with Fiorinal, he could function but was not
pain free. Dr. Sunderwirth recommended a consultation, and
plaintiff said he could not afford it. Dr. Sunderwirth told
plaintiff to discontinue Elavil and to start taking Desyrel,
another antidepressant. On August 6, 1991, plaintiff called in

10

asking for a refill on Fiorinal, and Dr. Sunderwirth approved the refill.  He refilled plaintiff's Soma on August 19, 1991.  On September 17, 1991, Dr. Sunderwirth refilled the Soma and the Fiorinal.  On October 14, 1991, the Soma and Fiorinal were both refilled.  On October 15, 1991, plaintiff saw Dr. Sunderwirth and said with his medication he could function and work daily in spite of discomfort.  Dr. Sunderwirth diagnosed somatic dysfunction[2] back, and fibromyalgia, again with no tests or examination noted.  On November 11, 1991, Dr. Sunderwirth approved refills of plaintiff's Soma and Fiorinal.  His Fiorinal was refilled again on December 12, 1991.

Dr. Sunderwirth refilled plaintiff's Fiorinal 13 times in 1992 and his Soma ten times (Tr. at 155-156).  It appears that plaintiff saw Dr. Sunderwirth on March 23, 1992, and the note states, "with above meds at least able to work."  Plaintiff complained of neck pain and back pain, and there is a note, "Pt appears to be in pain."  On September 15, 1992, it appears plaintiff saw Dr. Sunderwirth who wrote, "Still has chronic generalized pain from the fibromyalgic [sic]."  The record does not indicate that any examination was performed.  On November 12, 1991, when plaintiff called in for refills of his medications, he

_____

[2]Somatic dysfunction refers to impaired or altered function of related components of the somatic (body framework) system: skeletal, arthrodial, and myofascial structures, and related vascular, lymphatic and neural elements.

said "with the meds able to stay fucntinal [sic]. Without it house confined with pain."[3] Dr. Sunderwirth's diagnosis was somatic dysfunction back, fibromyalgia. There is no indication that any examination was performed.

On January 27, 1993, Dr. Sunderwirth's records indicate that plaintiff "needs release for work that physically able to perform [maintenance] work at warehouse." (Tr. at 156). Dr. Sunderwirth refilled plaintiff's Fiorinal seven times during 1993, and he refilled plaintiff's Soma six times that year (Tr. at 153, 156). It does not appear that plaintiff actually saw Dr. Sunderwirth any time during 1993.

Dr. Sunderwirth refilled plaintiff's Fiorinal and Soma three times during 1994 (Tr. at 153, 158). It does not appear that plaintiff saw Dr. Sunderwirth any time during 1994.

During 1995 Dr. Sunderwirth refilled plaintiff's Fiorinal 15 times (Tr. at 153, 158). He refilled plaintiff's Soma seven times. Plaintiff saw Dr. Sunderwirth one time during 1995, on June 19. He reported generalized muscle discomfort and occasional headache usually from cervical tension associated with extra hours at work. Dr. Sunderwirth diagnosed fibromyalgia and tension headaches. There is no indication that any examination

---

[3]According to plaintiff's work history report, he was working as an automotive installer and an armored car courier during 1992 (Tr. at 62).

was performed.

There are no records in 1996 until May 23 when plaintiff called in requesting a refill of Fiorinal (Tr. at 158). On June 19, 1996, he requested a refill of Soma and Fiorinal, but the notes say, "refused, need to come in befor[e] we will refill." On July 9, 1996, I assume plaintiff saw Dr. Sunderwirth because the records indicate that his medications were refilled. "Patient on same amount med as year or so ago. With this able to work. Dx: same." There is no indication that any exam was performed. Plaintiff's Fiorinal was refilled on November 26, 1996. During this year, plaintiff's prescriptions for Fiorinal went from a quantity of 30 to a quantity of 100.

On March 18, 1997, plaintiff saw Dr. Sunderwirth who noted limited motion of his right shoulder and diagnosed bursitis (Tr. at 158). Dr. Sunderwirth gave plaintiff a steroid injection in his shoulder. Plaintiff noted he was under a lot of stress due to two funerals. Dr. Sunderwirth refilled plaintiff's Soma and Fiorinal and prescribed Restoril, which treats insomnia. On July 2, 1997, he refilled plaintiff's Soma and Fiorinal and noted that the injection in plaintiff's shoulder had given him good relief. Plaintiff continued getting refills for Soma, Fiorinal, and Restoril for the remainder of 1997. The quantity of these drugs was "#C", which is not explained in the medical records.

Plaintiff first saw Dr. Sunderwirth in 1998 on March 4 (Tr. at 158, 186). He reported that he was "doing fine" and that he needed a prescription for Soma (300) and Fiorinal (300). He returned on June 25, 1998, and got another prescription for Soma (300), Fiorinal (300), and Restoril (60). On October 8, 1998, Dr. Sunderwirth refilled plaintiff's Soma and Fiorinal. Plaintiff reported no change, no specific complaints. "Pain is more in neck and upper back. Before starting above he used whiskey." On October 12, 1998, Dr. Sunderwirth discussed the recommendations of the Headache Care Center, and Dr. Sunderwirth recommended that plaintiff follow through.

On January 13, 1999, Dr. Sunderwirth's records begin with "Bryan wants to talk." (Tr. at 159, 186). It is unclear whether plaintiff actually saw Dr. Sunderwirth; there are no notes showing that any exam was performed. Plaintiff reported that he was taking Zanaflex, Vistaril, a "muscle stimilator [sic]", and Fiorinal, and with that combination "gets fair relief with these good results." On March 16, 1999, Dr. Sunderwirth refilled plaintiff's Fiorinal, Zanaflex, and Vistaril, and noted that plaintiff was doing well on his medications. He saw Dr. Sunderwirth on July 28, 1999, for bronchitis. On December 14, 1999, plaintiff reported that Fiorinal helps with headaches, but Vistaril was no longer helping with sleep. Dr. Sunderwirth

14

prescribed Restoril.

Plaintiff did not see Dr. Sunderwirth at all during 2000 (Tr. at 159, 186). The records show that Dr. Sunderwirth called in prescriptions throughout the year for Fiorinal, Zanaflex, and Restoril (also known as Temazepam, as reflected in this record). On November 20, 2000, the records show that plaintiff did not show up for his appointment and he did not call to say he would not be there.

Dr. Sunderwirth refilled plaintiff's Fiorinal and Zanaflex on April 25, 2001; refilled Zanaflex on August 7, 2001; and refilled Fiorinal on November 14, 2001 (Tr. at 159, 186). The records do not reflect that plaintiff was actually seen by Dr. Sunderwirth during 2001.

On February 25, 2002, plaintiff requested a refill of Restoril, but Dr. Sunderwirth refused to refill the prescription (Tr. at 159, 186-187). "Patient needs to be seen." Plaintiff came in on March 5, 2002, and had his blood pressure taken. He got a refill of the Restoril. Dr. Sunderwirth refilled plaintiff's Fiorinal on April 9, 2002, and on June 9, 2002. Dr. Sunderwirth also refilled plaintiff's Restoril on June 9, 2002. The records reflect that plaintiff was seen on June 6, 2002, but the only thing listed in the record is plaintiff's blood pressure. "Had to see patient before next refill. . . . Pain

15

med not as effective, pain worse with age." Plaintiff was also given a prescription for Elavil. On September 19, 2002, Dr. Sunderwirth called in a refill of plaintiff's Zanaflex. On November 14, 2002, Dr. Sunderwirth examined plaintiff to the extent of getting his height, weight, blood pressure, and other vital signs. He refilled plaintiff's Fiorinal and advised plaintiff to get further testing, but plaintiff was "not currently interested."

Plaintiff saw Dr. Sunderwirth three times during 2003, again just to get his height, weight, and vitals (Tr. at 187). Dr. Sunderwirth refilled plaintiff's Fiorinal in April, with a note "with current med[ications] headache in good control." He refilled plaintiff's Elavil, Zanaflex, and Fiorinal on August 5 and wrote, "Pt states with weight loss feeling better." Plaintiff's Elavil (also known as Amitriptyline, as shown in this record) was refilled in August, his Zanaflex (also known as Tizanidine, as shown in this record) was refilled in September, and his Fiorinal was refilled in December.

Plaintiff saw Dr. Sunderwirth three times during 2004 (Tr. at 187). His Fiorinal was refilled on February 2. He saw the doctor on June 23 just to get his weight and blood pressure and to refill his Fiorinal. That record states, "Feeling better since quit smoking 5 months ago." Plaintiff was seen on November

16

29 when Dr. Sunderwirth recorded plaintiff's weight, blood pressure, and other vitals, and he refilled plaintiff's Fiorinal, Zanaflex, and Elavil. The notes reflect that plaintiff wanted to increase his Elavil, so Dr. Sunderwirth increased the dosage from 4 mg to 25 mg.

October 18, 2004, is plaintiff's alleged onset date. Finally, plaintiff saw Dr. Sunderwirth in December 2004[4]. The record says, "needs excuse for work to continue 20 hours or less- full time causes too much back pain. Can only sit 4 hours at a time." There was no exam performed, no findings were noted, and Dr. Sunderwirth made no comment about plaintiff's desire to have this work excuse.

On December 20, 2004, Dr. Sunderwirth wrote a prescription which states, "Bryan is unable to work more than 4 hours at a time -- sitting that long causes a very high increase in back pain." (Tr. at 160).

On December 30, 2004, Kenneth Burstin, Ph.D., a clinical psychologist, completed a Psychiatric Review Technique (Tr. at 161-174). He found that plaintiff's mental impairment (depression not otherwise specified) is not severe. He found

---

[4]The exact day in December is unknown because a hole punch went through that part of the date (Tr. at 187). I imagine it was December 20 or shortly before because the restriction to part-time work requested by plaintiff was written by Dr. Sunderwirth on December 20.

that plaintiff suffers from mild restriction of activities of
daily living; mild difficulties in maintaining social
functioning; mild difficulties in maintaining concentration,
persistence, or pace; and has no episodes of decompensation.  In
support of his findings, Dr. Burstin wrote, "Claimant does not
allege any initial complaints of psy. related symptoms or
limitations.  Currently working below SGA [substantial gainful
activity].  Reports he decreased hours at work due to primarily
physical problems.  However, does complain of problems paying
attention.  MER [medical records] indicates no evidence of psy.
hospitalization.  No evidence of O/P specialized psy.
counseling/treatment.  TS [treating source] Sunderwirth notes
long-standing history with claimant.  9/1997 MER notes dx.
[diagnosis of] somatic dysfunction of back.  However, appears
related to lack of positive findings on examination and x-ray
evidence.  No noted other associated findings or complaints of
symptoms associated with formal dx. of somatiform.  Evidence
notes long-standing history and current medication for
depression.  ADL's [activities of daily living], claimant reports
problems with concentration and memory.  However, manages
finances, reports no problems with following instructions or
understanding.  Claimant circles problems with getting along with
others, then reports no problems with authority figures, and no

18

limitations interacting with family, friends, neighbors or others.  MDI [medically diagnosed impairment] established. However, ADL's and evidence does not support sx./lim. [symptoms/limitations] which are greater than non-severe. Despite dx. somatic dysfunction, appears dx. given based on lack of objective findings.  Claimant has worked despite symptoms at SGA level from at least 1987 - 10/18/04.  Allegations not credible.  Alleges disabling symptoms which he does not initially allege.  Inconsistences noted regarding adaptive functioning."

On June 29, 2005, plaintiff was seen at Doctors Hospital by Dr. Richard Baker, complaining of pain in his neck, back, and shoulders for the past 18 years (Tr. at 182-183, 195-196).  The records reflect he had been seeing Dr. Sunderwirth, and his diagnosis had been fibromyalgia.  Plaintiff's exam was completely normal including his musculoskeletal system and his extremities. The impression is listed as fibromyalgia, arthralgia (joint pain), and cephalgia (headache).  He was prescribed Vicodin (narcotic) and Flexeril (muscle relaxer).

On August 3, 2005, plaintiff was seen by Dr. Baker for a refill on his medication (Tr. at 194).  The records note that plaintiff's headaches had decreased since he stopped using Fiorinal.  He was assessed with arthralgia, fibromyalgia, and chronic constipation.  Dr. Baker refilled plaintiff's Vicodin and

Zanaflex.

On September 29, 2005, plaintiff was seen by Dr. Baker (Tr. at 192-193). Plaintiff's pain was noted as 4/10. He was assessed with fibromyalgia and chronic arthralgia. He was prescribed Vicodin.

On December 6, 2005, plaintiff was seen at Doctors Hospital by Dr. Baker (Tr. at 190-191). Plaintiff's chief complaint was "Rx refill". He reported joint pain and swelling in his left shoulder. Plaintiff had a positive trigger point on his shoulder, his range of motion was within normal limits. He was assessed with left shoulder bursitis, insomnia, and arthralgia (joint pain). The doctor prescribed Vicodin and Amitriptyline. He recommended plaintiff use warm compresses on his left shoulder.

On April 5, 2006, plaintiff saw Dr. Baker for a medication review (Tr. at 219, 227, 258). He noted that plaintiff complained of sleep problems, but not fatigue. Plaintiff also complained of muscle aches, back pain, and neck pain. Dr. Baker assessed chronic lower back pain and insomnia. He prescribed Vicodin, Zanaflex, and Elavil.

On May 16, 2006, plaintiff was examined by Charles Mauldin, M.D. (Tr. at 197-198). Dr. Mauldin's report reads in part as follows:

**History:**  This 39 year old right handed white male tells me that he has had fibromyalgia for 19 years.  It began after a car crash in which he tells me that he had a concussion, some lacerations, and broken nose, ribs and clavicle.  His wounds were sutured in the emergency room and he was given pain medicine and a rib belt.  He did not stay in the hospital.  Thereafter he sought Chiropractic treatment which did not help.  Eventually he started seeing Dr. Sunderwirth who provided osteopathic manipulation and various medications.  Currently he takes 3 Vicodin a day, 3-4 Zanaflex per day, 2 Aleve in the morning, and 1 Amitriptyline 25 mg. h.s. [at bedtime].

His worst pain is generally in his neck and it is constant. It hurts to move and occasionally causes him headaches.  He rates his current pain at a level 8 on a scale of 1-10 where 10 is the worst pain imaginable.  His pain, however, is difficult to describe, maybe it aches.  He has found nothing except the pills that help - maybe heat.

His Oswestry self-reported disability score is 64% (correlates with either a bedfast state or embellishment). I inquired about daily activity and he tells me that he doesn't feel like doing anything.  When he sits or stands for very long his pain is worse.

He has worked as a CAD [computer-assisted design] operator for the past 10 years.  Until a year and a half ago he was able to work this job full time by getting up and moving around periodically.  A year and a half ago he asked Dr. Sunderwirth to restrict him to 4 hours per day.

**Physical Examination:**  He is alert and cooperative in no apparent distress, able to move about the room freely. Height is 68" without shoes.  Weight is 186 pounds.  He moans throughout the examination.  He is able to walk with a normal gait and to walk on his heels and toes normally.  He squats fully and recovers without difficulty.

There is skin pinch tenderness over his neck and back with bony prominence tenderness about the shoulders.  There is diffuse mild tenderness throughout both upper extremities but no tenderness in the lower extremities.

He has give way weakness of both entire upper extremities except for the long finger flexors which appear normal.

21

Grip strength measures 55, 60 and 65 pounds on the right on 3 successive trials (pattern is opposite that expected). . . .

**Review of Medical Records:**  Medical records from Doctor's Hospital are reviewed and basically serve to confirm his prescriptions.  His examination is typically normal though sometimes having tenderness somewhere.  Strength is always normal.

**Impression:**  Complaints of pain with non-organic signs primarily due to the discordant Straight Leg Raising Test and co-contraction at the ankle when attempting to test strength.  I believe that Mr. Chadwick is willfully attempting to mislead this examiner.

**Discussion:**  I find no evidence of a condition that limits Mr. Chadwick's employability in any way.  In my opinion, fibromyalgia cannot be diagnosed in the presence of non-organic signs.

(Tr. at 197-198).

Dr. Mauldin found that plaintiff was "fully able" to sit, stand, walk, lift, carry, handle, hear, speak, and travel (Tr. at 199).  Plaintiff's range of motion was normal with the exception of his cervical spine which was somewhat limited (Tr. at 200-201).  His effort was listed as "poor" (Tr. at 200).  Dr. Mauldin found that plaintiff had no limitation in lifting or carrying, walking, standing, sitting, pushing, or pulling (Tr. at 202-203). He found that plaintiff could frequently climb, balance, kneel, crouch, crawl, or stoop (Tr. at 203).  He had no limitation in reaching, handling, fingering, feeling, seeing, hearing, or speaking (Tr. at 204).  He had no environmental limitations (Tr. at 205).

22

Plaintiff included a statement in the record which reads as follows: "The exam lasted about 20-25 minutes. Dr. Mauldin failed to mention several things in his report that I told him. I said my pain is a constant, aching pain that causes me fatigue, drains my energy, and I don't feel like doing anything. I told him that I have a heating pad that vibrates that I use frequently during the day and gives me temporary relief. I told him that physical activity makes my pain worse. Grip strength is not my problem. It is the repetitive motion that causes me pain and fatigue. Also, Dr. Mauldin indicated that my lumbar flexion-extension was 90 degrees. This is not an accurate reflection of my ability to bend in this manner. I would estimate that I can only bend 75 degrees." (Tr. at 141, 266).

On June 28, 2006, plaintiff saw Dr. Baker for a medication review (Tr. at 210-211, 216-218, 221-223, 255-257). The records show that plaintiff was able to get on and off the examining table "easily". His posture was normal and he was observed to sit comfortably. He denied symptoms of dizziness, lightheadedness, and memory loss. The only psychological symptom checked was insomnia. He was observed to be alert and oriented, positive, pleasant, focused, with normal gait and good eye contact. The records include the following: "Needs new note - Dr. S. now retired" and "Absence from work per Dr. Sunderwirth

('04), new note needed." The doctor prescribed Vicodin,

Zanaflex, and Elavil (Tr. at 210-211).

On July 5, 2006, plaintiff saw Rana Mauldin, M.D. (Tr. at

213-215, 261-263). Dr. Mauldin's report reads in part as

follows:

> SUBJECTIVE: Mr. Chadwick is a 39-year-old right-handed man
> who presents with neck and back pain. Mr. Chadwick tells me
> his pain began when he was involved in a single car accident
> at the age of 20 in 1987. He was the driver and hit a
> telephone pole. He did have some loss of consciousness at
> the time of the accident and suffered some minor fractures
> to the left clavicle, the ribs, and his nose. He was not
> kept overnight in the hospital. He sought treatment from a
> chiropractor for approximately 2 months following the
> accident without any benefit and then began treatment under
> the care of Dr. Sunderwirth. The patient tells me Dr.
> Sunderwirth was his physician for 17 years prior to his
> retirement. He received treatments that consisted of
> physical manipulation, trigger point injections, and
> physical therapy. He was also referred to a headache
> specialist and a psychiatrist. The trigger point injections
> would help him for 1 or 2 days. When he went for physical
> therapy he was given exercises but does admit that he no
> longer performs these exercises at home and, in fact, does
> not pursue any physical activity at this time. He was
> evaluated by a headache care specialist and placed on
> Zanaflex, which has helped keep his muscles relaxed, and he
> takes this 3 or 4 times per day. When evaluated by the
> physiatrist he was thought to have some problems with his
> long term memory, but the physiatrist did not treat him for
> depression. The patient does admit to feeling depressed,
> which he feels is situational. He does find that using a
> vibrating heating pad and using his medications regularly
> have helped keep his pain controlled. He has also found
> that by only working part time he can keep his pain level .
> . . lower. He was working full time until approximately 2
> years ago when his place of employment caught on fire. Due
> to this fire he was off work for approximately 6 months. He
> noticed that he felt significantly better while not working,
> and once it was time to return to work decided to return on
> a part-time basis. Dr. Sunderwirth supported his idea to

24

return to work part-time and even felt that he should apply
for disability due to his chronic pain.  The patient does
admit that he is currently applying for disability benefits.

His worst pain is described to be in the posterior neck but
also involves the mid back area.  He finds it difficult to
maintain any position for prolonged periods; described poor
sleep and feelings of depression.  Elavil seems to help
somewhat with his sleep. . . .  Aleve helps somewhat with
occasional burning pain but does cause some stomach upset.
His pain level ranges from a 4 to a 6. . . .  He finds he
can tolerate sitting for 45 to 60 minutes and stands for
about the same amount of time but can only walk up to 20
minutes at a time.  He described headaches as being
"tension-type" and occur often while he is working; but
since he has cut back to part-time he now only experiences a
headache approximately once a week. . . .  The mid back pain
is also described as a constant aching, ranging from a level
4 to 6.

                         *  *  *  *  *

SOCIAL HISTORY:  . . .  He smokes 1 pack of cigarettes per
day and generally drinks a 6-pack per week.

                         *  *  *  *  *

OBJECTIVE:
General:  The patient appears older than his stated age.
His hair is shoulder length and graying, and he has some
thinning of his hair.  He appears depressed and on the verge
of tearing.  He walks normally but with a head forward
position and with rounded shoulders.

                         *  *  *  *  *

Extremities:  Reveal normal joint exams with attention to
the shoulders with full shoulder range of motion and no
scapular winging.

Back:  . . .  There is tenderness throughout the cervical
spine and paraspinal muscles, as well as the upper trapezii
and rhomboids.  Cervical flexion is reduced by 50% and does
cause posterior neck pain.  Extension is reduced by 50% but
does not elicit any pain; lateral bending 50% with pain on
the contralateral side.  Rotation is essentially normal with

25

no complaints of pain.  There is tenderness of the mid
thoracic spine and paraspinal muscles.  Cervical lumbar
flexion is decreased by 50% with pain complaints.  Extension
is reduced by approximately 25% with pain complaints. . . .

IMPRESSION:
1.    Chronic cervico-thoracic sprain/myofascial pain.
2.    Depression.

RECOMMENDATIONS:  The patient is not interested in seeking
further treatment at this time.  He does not have any health
insurance.  He feels that he has been through thorough
treatment under the care of Dr. Sunderwirth.  He is advised,
however, to begin a walking program and decrease his smoking
and hopefully stop smoking.  He is advised to proper head
and neck posture and to reinitiate home cervical and
thoracic stretches, which were demonstrated to him today.

(Tr. at 212-214, 261-263).

On August 23, 2006, plaintiff saw Dr. Baker for a refill of

medication (Tr. at 224-226, 251-253).  The records show that

plaintiff's gait was normal, his posture was normal, he was

observed to sit comfortably, he could get on and off the exam

table easily.  The records also comment that plaintiff had seen

Dr. Mauldin and refused further treatment.  He was assessed with

lower back pain and was given a prescription for Vicodin,

Zanaflex, and Elavil.

On October 25, 2006, plaintiff saw Dave Weems, D.O., at

Doctor's Hospital for medication refills (Tr. at 248-250).  His

gait was normal, he was observed to sit comfortably, was able to

get on and off the exam table easily.  He complained of low back

pain.  He had no psychiatric symptoms, was observed to be alert

and oriented, positive, pleasant, focused, and with good eye contact. He was diagnosed with low back pain. He was prescribed Vicodin, Zanaflex, and Elavil.

On December 20, 2006, plaintiff saw Dr. Weems for sinusitis (Tr. at 245-247). He was prescribed what appears to be five different medications including Zanaflex and Elavil, but the remainder of the record is illegible.

On February 15, 2007, plaintiff saw Dr. Weems for medication refill (Tr. at 242-244). His gait was normal, he was observed to sit comfortably, was able to get on and off the exam table easily. He complained of low back pain. He had no psychiatric symptoms, was observed to be alert and oriented, positive, pleasant, focused, and with good eye contact. He was diagnosed with low back pain. He was prescribed Zanaflex and Elavil and apparently another kind of medication, although it appears the doctor just wrote "H" with a dosage. The remainder of the record is illegible.

On April 12, 2007, plaintiff saw Dr. Weems for left shoulder pain (Tr. at 239-241). His gait was normal, he was observed to sit comfortably, was able to get on and off the exam table easily. He complained of left shoulder pain and low back pain. He had no psychiatric symptoms, was observed to be alert and oriented, positive, pleasant, and focused. He was diagnosed with

27

low back pain and left shoulder pain.  He was prescribed Zanaflex and Elavil, the remainder of the record is illegible.

On June 7, 2007, plaintiff saw Dr. Weems for medication refill (Tr. at 236-238).  His gait was normal, he was observed to sit comfortably, was able to get on and off the exam table easily.  He complained of left shoulder pain and low back pain. He had no psychiatric symptoms, was observed to be alert and oriented, positive, pleasant, focused, and with good eye contact. He was diagnosed with low back pain and left shoulder pain.  He was prescribed Zanaflex and Elavil, the remainder of the record is illegible.

On August 2, 2007, plaintiff saw Dr. Weems for a medication refill (Tr. at 233-235).  His gait was normal, he was observed to sit comfortably, was able to get on and off the exam table easily.  He complained of left shoulder pain and low back pain. He had no psychiatric symptoms, was observed to be alert and oriented, positive, pleasant, focused, and with good eye contact. He was diagnosed with low back pain and left shoulder pain.  He was prescribed Zanaflex and Elavil, the remainder of the record is illegible.

## C.  *SUMMARY OF TESTIMONY*

During the March 2, 2006, hearing, plaintiff testified; and George Horne, a vocational expert, testified at the request of

28

the ALJ.

**1. Plaintiff's testimony.**

Plaintiff was 39 years of age at the time of the hearing and is currently 42 (Tr. at 276-277). He was 5'10" tall and weighed 190 pounds (Tr. at 277). Plaintiff is right-handed (Tr. at 277). He is single and has no children (Tr. at 277). Plaintiff completed high school and has a college degree in industrial management (Tr. at 277). Plaintiff drives once a day for about two hours total per week (Tr. at 278). At the time of the hearing, plaintiff was working part time on computer circuitry designs (Tr. at 278). Plaintiff's part-time hours began in October 2004 (Tr. at 278-279). The five months before that plaintiff's place of employment was shut down due to a fire (Tr. at 279). When he returned to work, he told his employer he could only work part time due to his disability (Tr. at 279). Plaintiff said he felt better during that five months he was off work than he had in a long time (Tr. at 279). Plaintiff discussed this with his treating doctor, Dr. Sunderwirth, who had since retired (Tr. at 279-280). Plaintiff now sees Dr. Bene[5] who worked with Dr. Sunderwirth (Tr. at 280). He sees Dr. Bene every other month (Tr. at 280).

---

[5]This appears to be a transcription error, as the doctors who were treating plaintiff from Doctor's Hospital, which is where Dr. Sunderwirth worked, are Dr. Baker and Dr. Weems.

Plaintiff works 16 to 20 hours per week earning $9.95 per hour (Tr. at 280-281). This is the same wage plaintiff earned working full time, and he performs the same duties as he did when he worked full time (Tr. at 281). Plaintiff sits at a computer while he is working (Tr. at 282). He works from 8:00 a.m. until noon (Tr. at 283). If he worked longer than that, he would have a stress headache (Tr. at 292). When he gets home from work, he lies on a vibrating heating pad and rests (Tr. at 283). He does this for about a half an hour, two to three times in the afternoons (Tr. at 290).

Plaintiff's disability stems from chronic muscle fatigue and pain (Tr. at 281). It is mostly in his neck, back, and shoulders (Tr. at 281). Plaintiff was diagnosed with fibromyalgia which involves generalized pain all over (Tr. at 292-293). He has "multiple painful regions or tender points, particularly along the axial skeleton.[6]" (Tr. at 293). Plaintiff has sleep disturbance, getting up multiple times per night (Tr. at 293). Plaintiff awakens with stiffness, and he takes a hot shower and two over-the-counter anti-inflammatories (Tr. at 293-294). At the time of the hearing, plaintiff was taking Vicodin, Zanaflex, and Amitriptyline[7] (Tr. at 283). Dr. Sunderwirth had plaintiff

[6]This was a question asked by plaintiff's counsel to which plaintiff responded, "yes" (Tr. at 293).

[7]Amitriptyline is also known as Elavil.

on Fiorinal #3 but the new doctor put him on Vicodin instead (Tr.
at 283-284). Plaintiff was on Fiorinal since about 1987 and he
became addicted to it (Tr. at 284). He stopped taking it about
eight months before the hearing (Tr. at 284). Plaintiff was
taken off the Fiorinal because it causes headaches, and he was
switched to Vicodin, also a narcotic, and he has not had as many
headaches (Tr. at 285). Vicodin helps plaintiff's pain much more
than Fiorinal did (Tr. at 285). The ALJ asked plaintiff if he
"traded one addiction for another", and plaintiff said, "I
suppose it is a fair statement, sir, but I have this pain, and
I'm going to have it the doctors tell me the rest of my life."
(Tr. at 285). Plaintiff's medications cause drowsiness,
lightheadedness, and loss of concentration (Tr. at 289).
Plaintiff takes his medication when he gets home from work (Tr.
at 289). If he took them in the morning, he would not be able to
concentrate at work (Tr. at 289). Plaintiff's pain is about an
eight on a scale of one to ten without his medication, and after
he takes his medication the pain goes down to a six (Tr. at 291-
292).

Plaintiff can do dishes for 20 minutes and can do a little
laundry (Tr. at 286). He mows the lawn with frequent breaks (Tr.
at 286). Plaintiff reads, watches television, and listens to the
radio (Tr. at 286). Plaintiff shops for groceries with his girl

31

friend occasionally, and he goes out to dinner occasionally (Tr. at 287). His hips hurt when he uses stairs (Tr. at 287).

Plaintiff can dress himself (Tr. at 287). He can walk about three to four blocks before he needs to stop (Tr. at 287). He can stand for 30 to 45 minutes at a time (Tr. at 288). He can sit for 30 to 45 minutes at a time (Tr. at 288). He can lift and carry ten pounds at the most (Tr. at 288).

Plaintiff is also being treated for depression (Tr. at 294). Plaintiff has no energy and he has bad thoughts sometimes (Tr. at 294). When asked why he cannot work full time, plaintiff said, "Due to my fibromyalgia, the pain and stiffness and headaches. I just, I'm unable to concentrate." (Tr. at 295).

**2. Vocational expert testimony.**

Vocational expert George Horne testified at the request of the Administrative Law Judge. Plaintiff's past relevant work consists of service station attendant, which is semiskilled medium exertion, but was performed at the light level; armored car guard/driver which is semiskilled, medium exertion, but was performed at the light level; drill press operator which is semiskilled, light exertion; electronics tester which is semiskilled, light exertion; and computer-aided design technician, which is skilled and performed at the light exertion level (Tr. at 296-297).

The first hypothetical involved a person with the limitations described by plaintiff during the administrative hearing (Tr. at 298). The vocational expert testified that the person could not perform any of plaintiff's past relevant work or any other work (Tr. at 298).

The second hypothetical involved a person with the limitations described by Dr. Burstin in his psychiatric review technique, i.e., mild psychiatric limitations (Tr. at 298). The vocational expert testified that such a person may not be able to perform the computer-aided design technician job because it is a skilled position, but the person could perform the other past relevant positions (Tr. at 298-299).

The next hypothetical involved a person who could perform unskilled sedentary work (Tr. at 299). The vocational expert testified that such a person could not perform plaintiff's past relevant work but could be a final assembler with 4,000 jobs in Missouri and more than 140,000 in the country, or an addresser, with over 2,000 jobs in Missouri and over 120,000 in the country (Tr. at 299).

The next hypothetical involved a person who could perform light work (Tr. at 299). The vocational expert testified that such a person could perform plaintiff's past relevant work as a drill press operator, an electronics tester, or a computer-

33

assisted design technician (Tr. at 299-300).

The next hypothetical involved a person who was limited to four hours of work per day (Tr. at 300). The vocational expert testified that such a person could not work full time (Tr. at 301).

The next hypothetical involved a person with moderate impairments in his ability to maintain concentration and attention, perform activities within a schedule, maintain regular appearance[8] and be punctual within customary tolerances, complete a normal workday and workweek without interruption from psychologically-based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods (Tr. at 301). The vocational expert testified that such a person could not perform full-time work (Tr. at 301).

The next hypothetical involved a person who would need to lie on a vibrating heating pad four times a day for 20 to 30 minutes each time (Tr. at 302). The vocational expert testified that such a person could not work (Tr. at 302).

**3.    Supplemental Hearing Testimony.**

On July 17, 2006, a supplemental hearing was held during which vocational expert Cathy Hodgson testified.

--------

[8]I believe counsel meant to say "attendance" rather than "appearance" or this is a transcription error.

34

The first hypothetical involved a person with the abilities consistent with those found by Dr. Walden[9] in the exam that was ordered at the conclusion of the first hearing (the result being that Dr. Walden found no limitations) (Tr. at 314). The vocational expert testified that the person could perform all of plaintiff's past relevant work (Tr. at 314). The next hypothetical involved a person with the limitations (mild) as found by Dr. Burstin, and the vocational expert testified that such a person could perform all of plaintiff's past relevant work (Tr. at 314). Not surprisingly, the vocational expert testified that a person with the limitations set out by Dr. Sunderwirth in his prescription limiting plaintiff to four hours of work per day could not perform a full-time job (Tr. at 315-316).

## V. FINDINGS OF THE ALJ

Administrative Law Judge George Wilhoit entered his opinion on September 6, 2006 (Tr. at 13-19).

Step one. Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 13, 14). Although plaintiff continued to work part time earing $9.95 per hour for 20 hours per week, his monthly earnings of $800 falls just a few dollars short of constituting substantial gainful activity (Tr.

---

[9]This appears to be yet another transcription error as this exhibit refers to the findings of Dr. Mauldin, not Dr. Walden.

at 13-14).

Step two.  Plaintiff suffers from a severe impairment of fibromyalgia (Tr. at 17).  He does not have a severe mental impairment (Tr. at 16, 17).

Step three.  Plaintiff's severe impairment does not meet or equal a listed impairment (Tr. at 18-19).

Step four.  Plaintiff retains the residual functional capacity to perform the full range of medium exertional work activity with the ability to lift 25 pounds frequently and 50 pounds occasionally, stand or walk up to six hours per day, and sit up to six hours per day (Tr. at 17).  With this residual functional capacity, plaintiff can return to his past relevant work as a service station attendant, an armored car guard/driver, a drill press operator, an electronics tester, or a computer aided design technician (Tr. at 18).

Therefore, plaintiff was found not disabled at the fourth step of the sequential analysis.

## VI.  CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988);  Benskin v. Bowen,

36

830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional

37

restrictions.   Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.

1984).   Social Security Ruling 96-7p encompasses the same factors

as those enumerated in the Polaski opinion, and additionally

states that the following factors should be considered:

Treatment, other than medication, the individual receives or has

received for relief of pain or other symptoms; and any measures

other than treatment the individual uses or has used to relieve

pain or other symptoms (e.g., lying flat on his or her back,

standing for 15 to 20 minutes every hour, or sleeping on a

board).

The specific reasons listed by the ALJ for discrediting

plaintiff's subjective complaints of disability are as follows:

> The claimant was seen for a consultative physiatric
> evaluation on May 16, 2006, by Charles Mauldin, M.D.  The
> claimant alleged having fibromyalgia for 19 years.  He noted
> that the claimant's self reported disability score was 64
> percent, which he stated corresponded to a bedfast state or
> embellishment. . . .  Based on several inconsistent results
> during the examination, Dr. Mauldin stated that he believed
> the claimant was "willfully attempting to mislead this
> examiner."  Based on the examination, Dr. Mauldin stated
> that he found no evidence of a condition that limits the
> claimant's employability in any way.
>
> . . .  The claimant was stated to not be interested in any
> further treatment.  The claimant was advised to begin a
> walking program and to decrease his smoking; and was
> instructed in proper posture and home stretching exercises.
>
> On the function report that the claimant completed as part
> of his application, he stated that his normal day includes
> personal care, working 4 hours, preparing meals, doing
> household chores, and watching television.  He said that he
> was able to do normal household indoor and outdoor chores

such as cleaning, laundry, household repairs, ironing,
mowing, etc.  He said that his overall activity level is
limited by his impairments and that he is not able to do as
much or as often as he did before. . . .

At the first hearing the claimant testified that he
continues to work part time, working on computer circuit
designs.  He said that he works 16 to 20 hours per week,
grossing $199 per week.  His change to part time work was
made after a fire at his employer's business which caused
the business to be shut down for five months.  After this
time off the claimant went to working part time.  He
testified that he works from 8 a.m. to noon.  He said that
he is paid at the same rate, and does the same work as when
he was working full time.  He testified that he can stand in
one place for 30 to 45 minutes at a time; sit for 30 to 45
minutes at a time; and carry 10 pounds . . .

. . .  [T]he claimant has a good work history.  The
undersigned also notes that the claimant asked his doctor to
restrict him to working 4 hours a day at the alleged onset
date.  With this the undersigned notes that the medical
record states "needs excuse for work to continue 20 hour or
less – full time causes too much back pain.  Can only sit 4
hours at a time."  This ongoing work activity equates to
just under the earning level that would be considered
substantial gainful activity.  This was started just one
month before the claimant filed his claim for disability.
The medical records of the claimant's primary treating
physician show infrequent treatment, and primarily
medication management. . . .  When the claimant found a new
treating physician, the initial record shows that the
claimant reported that he was off work for 6 months due to a
fire, and that he felt better when not working.  He said
that when the business reopened he decided to return to work
only part time and that his doctor supported his idea.  The
claimant's reported daily activities include personal care,
working daily, and normal household chores.  This activity
level is inconsistent with allegations of total disability.
The claimant testified that the hearing in March 2006 that
he could only sit or stand for 30 to 45 minutes at a time,
but reported to his new treating physician in July 2006 that
he could stand or sit for 45 minutes to one hour.  Although
the claimant alleged side effects of drowsiness to Social
Security, the medical records do not show that he complained
of this to his treating doctor on any continuing basis.

Case 6:08-cv-03098-REL   Document 18   Filed 02/17/09   Page 39 of 53

(Tr. at 14-16).

The ALJ thoroughly discussed the Polaski factors.  In addition to the evidence of credibility quoted above, I point out the following.  The article on fibromyalgia supplied by plaintiff indicates that a diagnosis normally requires 11 of 18 tender points and widespread pain.  Plaintiff was never found to have 11 tender points, he had no tenderness in his lower extremities (as determined by Dr. Charles Mauldin), and he complained of pain in his neck, back and shoulder, which is not "widespread pain."

Dr. Mauldin found that plaintiff had a normal gait, could heel-toe walk, and could squat fully and recover without difficulty.  Plaintiff's treating physicians Dr. Baker and Dr. Weems consistently reported normal findings on exam.  In addition, plaintiff denied dizziness, lightheadedness, and memory loss in June 2006 to his treating physician, even though he testified in March 2006 that these were side effects he suffered from his medications.  He reported to Dr. Baker in April 2006 that he had no fatigue, but in connection with his disability application he complained of fatigue.

Dr. Charles Mauldin found no limitations in plaintiff's residual functional capacity.  Dr. Rana Mauldin recommended that plaintiff begin a walking program, stop smoking, and start doing stretching exercises.  Although plaintiff told Dr. Rana Mauldin

40

that he was not interested in treatment because he could not afford it, he was smoking a pack of cigarettes per day and drinking beer during that time. Plaintiff had previously told Dr. Sunderwirth he was not interested in further testing or getting a consultation, and he admitted he had not been performing his physical therapy exercises at home.

Plaintiff told Dr. Rana Mauldin that his worst pain was in his neck but it also involved his mid-back. At the same time, his treating doctors, Dr. Baker and Dr. Weems, diagnosed lower back pain, not neck or mid-back pain.

During the hearing in March 2006, plaintiff testified that his pain is an 8 out of 10 before he takes his medicine, but his medication will bring it down to a 6. At the same time, he told Dr. Mauldin in connection with his disability application that his pain is an 8 out of 10. However, he told his treating physician, Dr. Baker, just a few months earlier that his pain was a 4 out of 10.

Dr. Charles Mauldin noted that plaintiff's self-reported assessment was consistent with being bedridden, his grip strength was opposite from what would be expected based on plaintiff's complaints, his effort was poor, and he was willfully attempting to mislead the doctor.

41

In his administrative reports, plaintiff checked "getting along with others" as something he has problems with, but he also wrote that he had no difficulty getting along with family, friends, neighbors, authority figures, or others. He noted that he can pay attention as long as it takes and that he can follow instructions "just fine" which is inconsistent with his hearing testimony.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's subjective complaints of disability are not credible.

## VII. OPINION OF DR. SUNDERWIRTH

Plaintiff argues that the ALJ erred in failing to give controlling weight to the opinion of Dr. Sunderwirth who wrote on December 20, 2004: "Bryan is unable to work more than 4 hours at a time -- sitting that long causes a very high increase in back pain."

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating

42

physician, then the ALJ must consider several factors to determine how much weight to give to the opinion of the treating physician: (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. § 404.1527(d)(2) - (5).

The ALJ discussed Dr. Sunderwirth's opinion in connection with his review of the other medical evidence:

> In considering the claimant's physical residual functional capacity, the undersigned notes that the claimant has required only limited medical treatment. He has a long history of mention of fibromyalgia, but without the medical record showing the basis for this diagnosis. The claimant recently changed primary care physicians, and the new records do not show a diagnosis of fibromyalgia. The physiatric consultative examination also does not show this as a diagnosis. For purpose of this decision, the undersigned noted the long period of diagnosis and medication management for fibromyalgia and accepts this, finding that it does result in more than a minimal limitation in the ability to perform work related activity, and therefore, si "severe." The undersigned notes that the initial determination was that the claimant had no "sever" physical impairment, and that the consultative examination showed no basis for limitation, stating that it appeared that the claimant was trying to mislead the examiner. Dr. Sunderwirth did show on a prescription form that the claimant could only sit for 4 hours at a time, but this appears to have been at the request of the claimant and he did not state that this was the limitation for an 8-hour day. This, combined with the limited treatment which was primarily medication management, results in giving his statement little weight.

Case 6:08-cv-03098-REL   Document 18   Filed 02/17/09   Page 43 of 53

(Tr. at 17).

**Length of Treatment Relationship**

There is no question that Dr. Sunderwirth treated plaintiff for years.

**Frequency of Examinations**

Although Dr. Sunderwirth treated plaintiff for well over a decade, he saw plaintiff infrequently (for someone who alleges disability). Dr. Sunderwirth saw plaintiff four times in 1990 but the records do not indicate that any exam was ever performed. He saw plaintiff six times in 1991, but again no exams. Plaintiff said during that year that he wanted Fiorinal #3. Dr. Sunderwirth gave plaintiff the prescription after "discuss[ing] chronic use of Fiorinal #3." It is unclear what that discussion entailed, because Dr. Sunderwirth continued to give plaintiff regular prescriptions for this narcotic medicine for years after that discussion. Also during 1991, Dr. Sunderwirth recommended a consultation, but plaintiff declined.

Plaintiff saw Dr. Sunderwirth possible three times in 1992 with no exams noted. The rest of that year consisted of many medication refills. 1993 started off with this note: "plaintiff "needs release for work that physically able to perform [maintenance] work at warehouse." Dr. Sunderwirth refilled plaintiff's Fiorinal and Soma many times that year, but the

44

records do not reflect that plaintiff actually saw Dr. Sunderwirth at all during 1993. Dr. Sunderwirth refilled plaintiff's Fiorinal and Soma during 1994, but the records do not reflect that plaintiff ever saw the doctor during that year. He refilled plaintiff's Fiorinal 15 times during 1995, and refilled the Soma seven time. Plaintiff saw Dr. Sunderwirth only once during that year. On that visit, Dr. Sunderwirth diagnosed fibromyalgia based on plaintiff's reported symptoms of generalized muscle discomfort and occasional headaches. The records do not reflect that any exam was performed.

There are no records in 1996 until May 23 when plaintiff called in requesting a refill of Fiorinal. On June 19, 1996, he requested a refill of Soma and Fiorinal, but the notes say, "refused, need to come in befor[e] we will refill." On July 9, 1996, I assume plaintiff saw Dr. Sunderwirth because the records indicate that his medications were refilled. "Patient on same amount med as year or so ago. With this able to work. Dx: same." There is no indication that any exam was performed. Plaintiff's Fiorinal was refilled on November 26, 1996. During this year, plaintiff's prescriptions for Fiorinal went from a quantity of 30 to a quantity of 100.

On March 18, 1997, plaintiff saw Dr. Sunderwirth who noted limited motion of the right shoulder and diagnosed bursitis. Dr.

45

Sunderwirth gave plaintiff a steroid injection in his shoulder. Plaintiff noted he was under a lot of stress due to two funerals. Dr. Sunderwirth refilled plaintiff's Soma and Fiorinal and prescribed Restoril, which treats insomnia. On July 2, 1997, he refilled plaintiff's Soma and Fiorinal and noted that the injection in plaintiff's shoulder had given him good relief. Plaintiff continued getting refills for Soma, Fiorinal and Restoril for the remainder of 1997.

Plaintiff first saw Dr. Sunderwirth in 1998 on March 4. He reported that he was "doing fine" and that he needed a prescription for Soma (300) and Fiorinal (300). He returned on June 25, 1998, and got another prescription for Soma (300), Fiorinal (300), and Restoril (60). On October 8, 1998, Dr. Sunderwirth refilled plaintiff's Soma and Fiorinal. Plaintiff reported no change, no specific complaints. "Pain is more in neck and upper back. Before starting above he used whiskey." On October 12, 1998, Dr. Sunderwirth discussed the recommendations of the Headache Care Center, and Dr. Sunderwirth recommended that plaintiff follow through. There are no records of any exams by Dr. Sunderwirth during 1998.

On January 13, 1999, Dr. Sunderwirth's records begin with "Bryan wants to talk." It is unclear whether plaintiff actually saw Dr. Sunderwirth; there are no notes showing that any exam was

46

performed.  Plaintiff reported that he was taking Zanaflex, Vistaril, a muscle relaxer, and Fiorinal, and with that combination "gets fair relief with these good results."  On March 16, 1999, Dr. Sunderwirth refilled plaintiff's Fiorinal, Zanaflex, and Vistaril, and noted that plaintiff was doing well on his medications.  On December 14, 1999, plaintiff reported that Fiorinal helps with headaches, but Vistaril was no longer helping with sleep.  Dr. Sunderwirth prescribed Restoril.

Plaintiff did not see Dr. Sunderwirth at all during 2000. The records show that Dr. Sunderwirth called in prescriptions throughout the year for Fiorinal, Zanaflex, and Temazepam. Plaintiff was not seen by Dr. Sunderwirth at all during 2001 either.  Instead, the doctor regularly called in refills of plaintiff's medications.

On February 25, 2002, plaintiff requested a refill of Restoril, but Dr. Sunderwirth refused to refill the prescription. "Patient needs to be seen."  Plaintiff came in on March 5, 2002, and had his blood pressure taken.  He got a refill of the Restoril.  Dr. Sunderwirth refilled plaintiff's Fiorinal on April 9, 2002, and he refilled plaintiff's Fiorinal again on June 9, 2002.  Dr. Sunderwirth also refilled plaintiff's Restoril on June 9, 2002.  The records reflect that plaintiff was seen on June 6, 2002, but the only thing listed in the record is plaintiff's

47

blood pressure.  "Had to see patient before next refill. . . . Pain med not as effective, pain worse with age."  Plaintiff was also given a prescription for Elavil. On September 19, 2002, Dr. Sunderwirth called in a refill of plaintiff's Zanaflex.  On November 14, 2002, Dr. Sunderwirth examined plaintiff to the extent of getting his height, weight, blood pressure, and other vital signs.  He refilled plaintiff's Fiorinal, advised plaintiff to get further testing, but plaintiff was "not currently interested."

Plaintiff saw Dr. Sunderwirth three times during 2003, again just to get his height, weight, and vitals.  Dr. Sunderwirth refilled plaintiff's Fiorinal in April, with a note "with current med[ications] headache in good control."  He refilled plaintiff's Elavil, Zanaflex, and Fiorinal on August 5.  Plaintiff's Elavil was refilled in August, his Zanaflex was refilled in September, and his Fiorinal was refilled in December.

Plaintiff saw Dr. Sunderwirth three times during 2004, the year plaintiff allegedly became disabled and the year Dr. Sunderwirth wrote the prescription at issue.  He refilled plaintiff's Fiorinal on February 2.  Plaintiff saw the doctor on June 23 just to get his weight and blood pressure and to refill his Fiorinal.  Plaintiff was seen on November 29 when Dr. Sunderwirth recorded plaintiff's weight, blood pressure, and

48

other vitals, and he refilled plaintiff's Fiorinal, Zanaflex, and Elavil.  The notes reflect that plaintiff wanted to increase his Elavil, so Dr. Sunderwirth increased the dosage from 4 mg to 25 mg.  There is no explanation in the records why the dose was increased other than that plaintiff requested it.  Finally, plaintiff saw Dr. Sunderwirth in December 2004.  The record says, "needs excuse for work to continue 20 hours or less-full time causes too much back pain.  Can only sit 4 hours at a time." There was no exam performed, no findings were noted, and Dr. Sunderwirth made no comment about plaintiff's desire to have this work excuse.  He simply wrote the excuse on a prescription pad, almost word-for-word the same as the request made by plaintiff.

Although there were many visits over the years, the factor we must look to is "frequency of examinations," not "frequency of visits" or "frequency of prescription refills."  Because the records do not establish that Dr. Sunderwirth performed any examinations other than occasionally getting plaintiff's height, weight, and vital signs, this factor weighs in favor of discrediting his opinion that plaintiff could not work for more than four hours.

### Nature and Extent of the Treatment Relationship

Nearly all of the visits to Dr. Sunderwirth were related to plaintiff's pain which he alleges has caused his disability.

49

*Supportability by Medical Signs and Laboratory Findings*

This factor clearly supports the ALJ's determination to discredit Dr. Sunderwirth's opinion. There is no evidence that Dr. Sunderwirth ever relied on medical signs or laboratory findings in making his diagnoses, in prescribing medications, or in opining plaintiff's lack of working ability.

In 1991, plaintiff said he wanted to take Fiorinal, and Dr. Sunderwirth prescribed it. Despite talking to plaintiff about its addictive nature, Dr. Sunderwirth continued to refill plaintiff's Fiorinal through the end of 2004 -- 13 years later. Dr. Sunderwirth recommended a consultation, and plaintiff declined, with no adverse consequences. In 1995 Dr. Sunderwirth diagnosed fibromyalgia based entirely on plaintiff's reports of generalized muscle discomfort and occasional headaches. He performed no exam. In 1997 plaintiff said two funerals caused him stress; therefore, Dr. Sunderwirth prescribed Restoril and kept plaintiff supplied with Restoril for years after that. In 2002, he recommended further testing, but plaintiff said he was not interested. Still, the narcotics kept coming. In 2004, plaintiff said he wanted his dose of Elavil increased, and Dr. Sunderwirth increased it without any notes as to why that was justified. That same year, Dr. Sunderwirth wrote the opinion at issue here because, as is indicated in his records, plaintiff

50

said he needed it.  There is not one mention or complaint anywhere in the more than 15 years' worth of medical records that plaintiff was having trouble sitting or was unable to work for more than four hours per day.  There is no question based on this record that the opinion was written for no reason other than that plaintiff asked for it.

**Consistency of the Opinion with the Record as a Whole**

Not surprisingly, Dr. Sunderwirth's opinion is inconsistent with the credible evidence in the record.  The exams of Dr. Baker and Dr. Weems were always normal.  Dr. Burstin found that plaintiff's impairment was not severe.  Dr. Charles Mauldin found that plaintiff was willfully attempting to mislead the examiner, and he found that plaintiff had no physical limits at all.  Dr. Rana Mauldin noted that plaintiff was not interested in further treatment, and her recommendation was for plaintiff to start walking, stop smoking, and do home stretching exercises.

There simply is no other medical evidence that comes close to supporting the findings of Dr. Sunderwirth that plaintiff cannot sit or otherwise work for more than four hours per day.

**Specialization of the Doctor.**

There is no evidence that Dr. Sunderwirth is a specialist of any kind.

Dr. Sunderwirth's opinion is not based on anything other than plaintiff's desire to have this particular restriction.  In fact, in plaintiff's administrative paperwork he wrote, "At my request, I work part time, 4 hours a day, 5 days a week."  That statement is consistent with the records of Dr. Sunderwirth.

Considering all of the factors discussed above, I find that the substantial evidence in the record as a whole supports the ALJ's decision to give little or no weight to Dr. Sunderwirth's opinion that plaintiff could not sit or work for more than four hours per day.

## VIII.  HYPOTHETICAL

Finally, plaintiff argues that the ALJ erred in failing to adopt the vocational expert's responses to a hypothetical question, i.e., that plaintiff was unable to work.  This is based on the ALJ's assessing plaintiff's residual functional capacity as being able to sit for more than four hours per day.  That argument is without merit given the discussion above regarding Dr. Sunderwirth's opinion.

A residual functional capacity assessment is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments.  20 C.F.R. § 404.1545.  The ALJ determined that plaintiff retained the residual functional capacity to perform medium work which

52

included sitting, standing, or walking for up to six hours each day. The ALJ supported this RFC finding by discussing at great length the medical records outlined above. The ALJ is only required to consider credible limitations in determining whether the plaintiff could perform his past relevant work. <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 804 (8th Cir. 2005). I find that the ALJ considered all of plaintiff's credible impairments when he assessed plaintiff's residual functional capacity, and that based on that RFC, plaintiff is capable of returning to his past relevant work.

## IX. CONCLUSION

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


<span>/s/ Robert E. Larsen</span>
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 17, 2009

53